IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE STAND 'N SEAL, PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1804 ALL CASES<br><br>1:07 MD1804-TWT |

ORDER

This is an MDL proceeding in which about 200 personal injury actions are consolidated for pretrial proceedings. It is before the Court on the Defendants' Motion to Exclude the Affidavit of Carol Pollack-Nelson [Doc. 2088] and Motion to Exclude Expert Testimony of Carol Pollack-Nelson [Doc. 1432]. For the reasons set forth below, the Defendants' motions are DENIED.

I. Background

This MDL proceeding includes about 200 lawsuits filed by users of Stand 'n Seal "Spray-On" Grout Sealer. Stand 'n Seal is a consumer product used to seal tile grout in kitchens, bathrooms, and similar areas. The advantage of Stand 'n Seal is that users can easily stand and spray the sealant onto the grout without the strain of using a brush and manually applying the sealant. The Plaintiffs say that the problems with Stand 'n Seal began when the manufacturer changed its chemical components.

Stand 'n Seal was originally manufactured with a fluoropolymer chemical known as Zonyl 225.[1]  But from April to May 2005, and again in July 2005, the manufacturer of Stand 'n Seal switched from Zonyl to a different fluoropolymer chemical known as Flexipel S-22WS.  The Plaintiffs say that users of Stand 'n Seal immediately began experiencing respiratory problems, such as chemical pneumonitis, from exposure to Stand 'n Seal.  By August 31, 2005, Stand 'n Seal with Flexipel was recalled.

As a result of their injuries, consumers all over the country filed lawsuits asserting various claims against each of the companies involved in the manufacture, distribution, and sale of Stand 'n Seal with Flexipel.  On January 5, 2007, the Judicial Panel on Multidistrict Litigation transferred the federal lawsuits to this Court for consolidated pretrial proceedings.  In their initial disclosures, the Plaintiffs disclosed several expert witnesses that will testify at trial.  One of those experts is Carol Pollack-Nelson.  The Defendants now move to exclude the affidavit and expert testimony of Pollack-Nelson.

---

[1] Fluoropolymers are known for exceptional chemical resistance and high-temperature stability.  The most commonly known fluoropolymer is probably the DuPont brand Teflon.  Teflon is used in hundreds of products, including coating non-stick frying pans.

II. <u>Discussion</u>

A.   <u>The Affidavit</u>

The Defendants move to exclude the affidavit of Carol Pollack-Nelson. The affidavit was submitted by the Plaintiffs after the Defendants filed a motion to exclude her expert testimony. The Defendant says that the affidavit should be excluded because of the "sham affidavit" rule. Under the sham affidavit rule, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." <u>Van T. Junkins & Assocs., Inc. v. U.S. Industries, Inc.</u>, 736 F.2d 656, 657 (11th Cir. 1984). The Defendants bear a heavy burden in order to exclude an affidavit under the sham affidavit rule. The Defendants have not met that burden in this case. For all of the statements that the Defendants say violate the sham affidavit rule, the Defendants have not shown that the questions were unambiguous, that the answers were clear, or that there is no explanation for any alleged contradiction. It is true that there are some differences between the deposition of Pollack-Nelson and her affidavit. But those are simply "discrepancies which create an issue of credibility or go to the weight of the evidence." <u>Tippens v. Celotex Corp.</u>, 805 F.2d 949, 953 (11th Cir. 1986). Therefore, the affidavit from Pollack-Nelson should not be excluded under the

sham affidavit rule.

The Defendants also say that the affidavit should be excluded because the affidavit contains new expert opinions that were not disclosed in Pollack-Nelson's expert report or deposition. Under Rule 26 of the Federal Rules of Civil Procedure, "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under [the expert witness rules]." Fed. R. Civ. P. 26(a). This disclosure must be accompanied by a written report, and the written report must contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(b)(i). The reason for the expert disclosure rule is "to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Reese v. Herbert, 527 F.3d 1253, 1265 (11th Cir. 2008).

After careful review of Pollack-Nelson's expert report, deposition testimony, and affidavit, Pollack-Nelson's affidavit should not be excluded. Although the statements in her affidavit are not identical to the statements in her expert report, they "[do] not differ substantially." Rowe Int'l Corp. v. Ecast, Inc., 586 F. Supp. 2d 924, 935 (N.D. Ill. 2008). In her affidavit, Pollack-Nelson says that she was asked to evaluate "whether the warning labels were adequate and whether the conduct of the manufacturers and distributors with regard to product safety was reasonable."

(Pollack-Nelson Aff. ¶ 4.)  The Defendants say that, before her affidavit, Pollack-Nelson only discussed the conduct of consumers and warning labels, and that she has now expanded the scope of her expert testimony by discussing the conduct of the manufacturers and distributors with regard to product safety.  But Pollack-Nelson made numerous statements about this issue in her expert report and during her deposition.  In her expert report, Pollack-Nelson said that "[b]efore releasing the reformulated Stand 'n Seal into the market, product testing was necessary to identify potential hazards and ways to address these hazards."  (Core Expert Disclosures by Pls., Ex. A, at 15.)  She also said that "[i]t is the manufacturer's responsibility to identify potential hazards in their products through research and testing."  (Id., at 16.) This was reiterated during Pollack-Nelson's deposition:

> Any manufacturer of any product or any component of that product, if they have an awareness that there is a hazardous aspect to their product, then they have an obligation to warn the recipient of that product.  So when I talked earlier about the final manufacturer being Roanoke, that's when I talk about that, I'm talking about what is their obligation to the consumer, because the final recipient of the completed packaged product is the consumer.  So that's why I was talking about consumer warnings being important.  That's not to say that it's not important to provide warnings down the line, you know, for the individual manufacturers of the components to their recipient as well.

(Pollack-Nelson Dep. at 242-43.)  It is true that, compared to her expert report and deposition testimony, some of the statements in Pollack-Nelson's affidavit elaborate on the conduct of the manufacturers and distributors with regard to product safety.

But some elaboration is allowed. See Emcore Corp. v. Optium Corp., Civ. A. No. 6-1202, 2008 WL 3271553, at *4 (W.D. Pa. Aug. 5, 2008) (allowing elaboration of "an opinion/issue previously addressed in [the expert's] report"); Forest Labs., Inc. v. Ivax Pharms., Inc., 237 F.R.D. 106, 113 (D. Del. 2006) (same). In her affidavit, Pollack-Nelson also cites to the Consumer Product Safety Commission's Handbook for Manufacturing Safe Consumer Products. (Pollack-Nelson Aff. ¶ 5.) The Defendants say that this is the first time that Pollack-Nelson has cited to this source. But she does not rely on this source to provide new opinions. Instead, Pollack-Nelson cites to this source to show that her methods are consistent with the published literature and to respond to new issues raised by the Defendants during her deposition.

In her affidavit, Pollack-Nelson also describes her analysis of Stand 'n Seal as a post-market hazard analysis. (Pollack-Nelson Aff. ¶ 4.) The Defendants say that this is the first time that Pollack-Nelson disclosed that she conducted a post-market hazard analysis. But Pollack-Nelson has simply used a different name to describe her analysis of the product. In substance, she is discussing the same things that she discussed in her expert report and during her deposition. The Defendants object to other parts of Pollack-Nelson's affidavit, but those objections are also without merit and do not require additional discussion. Therefore, Pollack-Nelson's affidavit should not be excluded.

B.   The Expert Testimony

The Defendants move to exclude expert testimony from Carol Pollack-Nelson. The Defendants say that her testimony should be excluded because it does not meet the requirements for admissible expert testimony. Rule 702 provides that:

> [A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993). The reason for these requirements is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). The party offering testimony from an expert must show by a preponderance of evidence that the testimony is admissible. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

The Plaintiffs offer Pollack-Nelson as an expert in human factors in the area of consumer products. Human factors is "the scientific discipline concerned with the understanding of interactions among humans and other elements of a system, and the profession that applies theory, principles, data, and other methods to design in order to optimize human well-being and overall system performance." Human Factors and

Ergonomics Society, About HFES, http://www.hfes.org/web/AboutHFES/about.html (last visited May 20, 2009). She was asked to evaluate "whether the warning labels were adequate and whether the conduct of the manufacturers and distributors with regard to product safety was reasonable." (Pollack-Nelson Aff. ¶ 4.) She was given pleadings, deposition transcripts, material safety data sheets for Flexipel and Stand 'n Seal, marketing information for Stand 'n Seal, incident data and recall information from the Consumer Product Safety Commission, and numerous samples of Stand 'n Seal cans, labels, and instructions. (Core Expert Disclosures by Pls., Ex. A, at 1-2.) She reviewed this information to assess the potential hazards of Stand 'n Seal, and then, based on her expertise in human factors, evaluated whether the warning labels and conduct of the Defendants addressed these potential hazards. (Pollack-Nelson Aff. ¶ 4.) Pollack-Nelson's opinions are that consumers were using Stand 'n Seal for its intended purpose, consumers reasonably followed precautionary warnings; the Defendants knew or should have known that Flexipel should not be aerosolized; warning labels on the original and revised cans of Stand 'n Seal were inadequate; and the Defendants should have conducted product testing to identify potential hazards before introducing Stand 'n Seal into the market. (Core Expert Disclosures by Pls., Ex. A, at 8-16.)

      Pollack-Nelson's expert testimony should not be excluded. She is qualified to

testify about the human factors involved in the manufacture and marketing of Stand 'n Seal. She holds a M.Phil. and a Ph.D. in Industrial/Organizational Psychology from The George Washington University, with a concentration in human factors. (Pollack-Nelson Aff. ¶ 3.) She worked at the Consumer Product Safety Commission from 1988 to 1993, where she was a Senior Engineering Psychologist in the Division of Human Factors, and a technical expert to the Office of Compliance and Litigation. (Id.) While she was at the Consumer Product Safety Commission she provided assessments of how product design, warnings, and instructions would influence consumer use, opinions of hazards based on product design, and trained investigators. (Id.) Since 1994, Pollack-Nelson has practiced as an independent safety consultant, specializing as a human factors expert in safety of consumer products. (Id.) This includes consultant work for the Consumer Products Safety Commission. (Id.) Pollack-Nelson has also published and presented many articles relating to product safety. (Id.) The Defendants say that Pollack-Nelson is not qualified because she has only worked on one or two aerosol products. But "[a] human factors expert . . . can render opinions on various types of consumer products based on the general knowledge and understanding of human behavior as it relates to consumer products." (Pollack-Nelson Aff. ¶ 4.)

Pollack-Nelson's expert testimony is based on sufficient facts and data. She

came to her opinions after reviewing pleadings, deposition transcripts, material safety data sheets for Flexipel and Stand 'n Seal, marketing information for Stand 'n Seal, incident data and recall information from the Consumer Product Safety Commission, and numerous samples of Stand 'n Seal cans, labels, and instructions. The Defendants say that Pollack-Nelson's testimony is not based on sufficient facts or data because she did not do any testing to determine whether a different warning label or use of a respirator mask would have prevented injuries. But she has not offered an opinion that a different warning label or use of a respirator mask would have prevented injuries. As Pollack-Nelson explains in her affidavit:

> Whether such a mask would have prevented the injuries is beyond my field of expertise, but if there is evidence such a mask would have shielded the consumers from the hazards of the product, then assuming the hazard could not be eliminated from the product, a reasonable manufacturer would have provided such a shield against the risk of injury or at the very least, notified consumers of the need for such protection. If such a mask would not have shielded the consumer from the hazards of the product, it is my opinion that a reasonably prudent manufacturer would not have introduced to the market this consumer product as an aerosol with Flexipel S-22WS. . . . Even if one were to determine it was not unreasonable to market Stand 'n Seal with Flexipel S-22WS, the warnings provided on the product label were inadequate.

(Pollack-Nelson Aff. ¶¶ 8-9.)

Pollack-Nelson's expert testimony is also the product of reliable principles and methods, and she has reliably applied those principles and methods to the facts of this case. Her principles and methods are the same that she used when she worked at the

Consumer Product Safety Commission. (Pollack-Nelson Aff. ¶ 4.) Pollack-Nelson began by assessing the potential hazards of Stand 'n Seal. As she has explained, this was a "post-market analysis" that involved reviewing material safety data sheets, marketing information, incident data and recall information, and samples of Stand 'n Seal. (<u>Id.</u>; Core Expert Disclosures by Pls., Ex. A.) She focused on the "foreseeable intended uses of the product including identification of users, patterns (e.g., duration and frequency) and methods of use." (Pollack-Nelson Aff. ¶ 4.) After assessing the potential hazards of Stand 'n Seal, Pollack-Nelson evaluated how the Defendants addressed these hazards in light of the "Safety Hierarchy for Hazard Prevention." (<u>Id.</u>) This included whether the Defendants' warning labels satisfied the requirements of the American National Standard for Product Safety Signs and Labels. (<u>Id.</u>; Core Expert Disclosures by Pls., Ex. A.) Her principles and methods are also consistent with the <u>Handbook for Manufacturing Safer Consumer Products</u>, which is published by the Consumer Product Safety Commission. (Pollack-Nelson Aff. ¶ 5.)

Based on some statements that she made about the Defendant Roanoke Companies Group, Inc., the Defendants say that Pollack-Nelson's testimony is not relevant to this case. During her deposition, she agreed that "in order to create warnings or labeling for the changed product, Roanoke would have had to have been told that the product had actually been changed." (Pollack-Nelson Dep. at 112.) But,

as the Plaintiffs point out, Pollack-Nelson does not intend to testify as an expert on Roanoke's relationship with its suppliers, and so her statements are not conclusive on this factual question. It may be that the Plaintiffs must ultimately show that Roanoke was aware or otherwise responsible for changes in its product. But at this pre-trial stage, Pollack-Nelson's expert testimony about Roanoke's warning labels is sufficiently relevant even if she cannot establish whether Roanoke knew that the chemical ingredients in Stand 'n Seal had been changed. See Fed. R. Evid. 104(b). Therefore, Pollack-Nelson's expert testimony should not be excluded.

### III. Conclusion

For the reasons stated above, the Defendants' Motion to Exclude the Affidavit of Carol Pollack-Nelson [Doc. 2088] and Motion to Exclude Expert Testimony of Carol Pollack-Nelson [Doc. 1432] are DENIED.

SO ORDERED, this 11 day of June, 2009.


                                          /s/Thomas W. Thrash
                                          THOMAS W. THRASH, JR.
                                          United States District Judge